May it please the court, Justin Lichterman with me today is the petitioner Charanjit Singh at council table and my colleagues Ruth Kwan and Shanita Jaffer from the Oryx firm. We have a lot to talk about today, particularly with respect to the Board of Immigration Appeals egregious errors in its decision. But before we do that, I think we can't lose sight of one overarching point that weighs on this case. And that is that Mr. Singh is an admissible alien who is prima facie eligible for adjustment of status. This court recognized that fact when it directed that the case be sent to Ninth Circuit immigration mediation. And the government has never ever disputed that fact, the details of which are laid out in our opening brief. That means that deportation in this case, removal in this case, serves absolutely no purpose other than to rip apart a family and send Mr. Singh back to India where he can simply apply to return here and have to jump through the red tape and bureaucratic hoops of doing so from India. I don't know why the government is adamant on advancing that position, but I do know I gather. No, Your Honor. To be honest with you, while I don't want to speak too much about the mediation, I really don't. You know, I do know, though, that it defies common sense, that it defies any notion of justice and fairness. Mr. Singh is married to a United States citizen, and he's received an approved I-130 visa petition from the government. That's a critical fact in this case, because it means it's not just his rights that are being implicated, but the rights of his United States citizen wife and his United States citizen stepchildren. He's never committed a crime. He pays his taxes, jointly with his wife, I might add. He shows up at every immigration proceeding, including his current supervised release, and he's the only father that two young children, C.J. Angelino and Harpreet Singh, have ever known. Frankly, this is not someone we should be wasting our time trying to deport. This is someone that we should allow to reopen their case so that he can obtain a hearing on his entitlement to adjustment of status, a hearing that was stripped from him. Could you address what the error is that the BIA made? I mean, we're not the administrative agency who's given the authority to make those decisions on the equities. Absolutely, Your Honor, but I disagree with you. I think you are able to address the issues on the equities for two reasons. The equities play a big part in evaluating whether, in fact, there has been ineffective assistance of counsel here, which is the core issue. And second of all, they play a big part in assessing the errors that the BIA made. I'm going to jump directly to those because I'm going to assume, based on your question, Your Honor, that you're not too interested in going into the details of Mr. Kang's incompetence. Those have been widely documented by this Court, including members of this panel. Again, the government's not even contesting that he's an incompetent lawyer. So, Oreck, according to my chronology, Oreck learned that Mr. Kang was disbarred on October 2007, and the motion to reopen based on ineffective assistance of counsel was filed in April 2008. So what's the reason for the lengthy delay between the period when you learned or Oreck learned about the disbarment to the actual filing of the motion to reopen? A number of reasons, Your Honor. First of all, Oreck at that time was appointed as pro bono counsel for mediation purposes only. I saw that in your brief, and that raised a question for me. I'm not sure what the scope was of the mediation. I mean, normally I would expect that when you're mediating, you would evaluate your client's file to see what the strengths and weaknesses were of your client's case. Is that not a normal part of a mediation? That's absolutely a normal part of a mediation, Your Honor. But a mediation is not a litigation. But wouldn't you have evaluated your client's file in preparation for mediation? Absolutely, Your Honor. And I want to back up a second, because you threw out an October 2007 date. I'm not sure where that date came from. But we should talk about that evaluation process, because that's more than just learning that prior counsel has been disbarred. As the government will tell you, and did tell us numerous times, and in fact is probably the one thing where they've got the law right, the fact that prior counsel is disbarred is not evidence of ineffective assistance of counsel. Well, but you got the file in August 2007, again, according to my chronology from, I assume, from your brief or from the papers, from the files. So at that point, you know, I would assume that the attorney would review the file and become aware of the ineffective assistance of counsel. But you seem to indicate in your brief that it wasn't until you learned that Mr. King was disbarred that was really a red flag that your client might be suffering from ineffective assistance of counsel. So that's why I started with the October 2007 date. Yes, Your Honor. That August 2007, when you actually got the file, might be a better date to start looking. No, Your Honor. Let's be real clear on the dates and what happened when, because these are critically important. On August 30, 2007, OREC was appointed pro bono counsel for mediation purposes only. OREC did not receive the file on that date. When did OREC get the file? Your Honor, my recollection is we got it sometime in September, October. I don't recall the exact date. But even that's not the dispositive question. Under the case law, the dispositive question is when did we know, and this is the Garamani case, that when did we definitively learn, that's what the Garamani case says, of deficient performance. Definitively learn of deficient performance. Well, let's – I mean, the hard question here, as Judge Acuda says, is if you had the file. I thought it was more like November 2nd or something. It's a little fudgy the way you say it in the brief, so I can't tell. You said you had it by November 2nd or something, so I don't know exactly when you had it. But you had to prepare for the mediation. Correct. So you had to read the file and you had to evaluate the case. Whether the lawyer was disbarred or not disbarred really isn't the question, as you say. So if there was obvious ineffective assistance, it should have been recognizable when you read the file. And you should have read the file sometime not too long after you got it because you needed to mediate the case. So what's the problem? I think, Your Honor, I'm having trouble with the word obvious ineffective assistance. There was ineffective assistance here, but I'm not so sure it was obvious. I think it's a Trojan horse here. I think you have to dig deep. You have to figure out that it's not enough that Mr. Kang is disbarred, that he has a record of ineffectiveness which was obvious, which we discovered before the mediation and which we raised before the mediation. It's was he ineffective in this case? What was it that was ineffective in this case? Did it prejudice Mr. Singh? And how? Those are the important details that you've got to assess. Well, I mean, to be frank about it, the reason you didn't notice it flat out was probably because you're not immigration lawyers. You're quite wonderful lawyers, but you're not immigration lawyers. And so what presumably you didn't notice was that he had not brought the adjustment of status issue where it belonged, which was basically to the BIA at any reasonable time that it might have been helpful. I think that's partially true, Your Honor. I will concede that. It doesn't jump out at me as a securities litigator that, whoa, looking at this file I see immediate ineffective assistance. I did my homework. I did my due diligence. And I did what the law requires, which is not just guess and take shots in the dark, but do legal research, figure out if there is a basis to claim that someone was ineffective. And that's important here, because based on the record, what it really looks like is it's the regulations that are a problem, and it's the one hand of the government not knowing what the other hand of the government is doing that's the problem. That's what it looks like. And that's even reflected a little bit in the court's order directing the case to mediation, which is, gee, it really looks like this guy's admissible, and DHS is not talking to ICE or EOIR or any other acronym you want to throw out there that relates to immigration. So when you look at this file, you see a situation where it looks like you have an individual that the government has said is entitled to an I-130 visa petition based on his marriage to a U.S. citizen, and so is eligible for adjustment of status, left hand. But on the right hand, they're saying, wait a minute, we've got to throw this guy out. And the regulations are saying, sorry, you're 90 days of pause, no way to reconcile the two. That's what this case looks like when it arrives on someone's desk. That's what this case looked like when it arrived on my desk. Okay, but then the question is, why isn't it what that would look like to Mr. Kang, so he really wasn't so ineffective? In other words, he may have been wrong, but why was he- A couple of reasons. First of all, I don't care how things look to Mr. Kang. He was hired and paid money to represent someone as an immigration attorney. And as Your Honor has noted in the Itabarria decision, that's exactly why aliens hire immigration specialist attorneys. It's his job to figure that out, and it's his job to figure it out when he gets hired. If he had done that, and there is case law that the OREC firm discovered subsequently during the course of the mediation that says there is a way to deal with that. You move to continue the BIA proceedings and to remand. That's not reflected anywhere in the regs, by the way. That's something you have to dig into case law to find, and there's one case that addresses it, a 2002 case that overturned prior precedent. Now let's talk about why Mr. Kang didn't see it. Let's talk about that, because he's representing Mr. Singh at the time, and he should have found that case. He should have found that case because this court directed that he attend CLE courses on immigration so that he could improve his representation of people like Mr. Singh. He didn't do that. This court said in its order he didn't certify, like he was required to do, that he was attending those courses. So I think this is not an easy and effective case. I'll grant you that. It's not someone who just doesn't file an opening brief on appeal, but it is a very clear and effective case when you dig into it and when you think about the factors that are going on here. I have about a minute left, but I would like to reserve a minute, but I'd like to address Judge Aikuda's question real quick. I think you're actually over a minute, but go ahead. Oh, I'm sorry. Go ahead. Judge Aikuda, you asked me what the errors were. First of all, the BIA applied Lozada rigidly. This circuit does not apply Lozada rigidly. It said there was no affidavit submitted by Mr. Singh. Look at the record. There's an affidavit submitted by Mr. Singh. It's JSAR 000134-37. That declaration painstakingly outlines Mr. Singh's agreements with Kang. The BIA said there was no such affidavit. When the BIA ignores the record. The larger point is he wasn't a member of the bar. That's for compliance with the other elements of Lozada. So we have case law saying he's not a member of the bar. It doesn't make any point to doing this because nothing's going to happen? Yes, absolutely. It's futile. There's a couple of cases. Reyes v. INS. It's futile. There's a case with Mr. Singh himself, which is cited in our brief, and I had it written down here. Mr. Kang, you mean? Sorry, Mr. Kang. Yes, Your Honor. A case involving Mr. Kang, this Court issued it last year. To notify him and comply with Lozada with respect to that attorney would be futile. If there are any further questions, I'm happy to address them. Thank you. Including what relief is appropriate here, Your Honor. Thank you very much. Good morning. Steve Day for the Department of Justice. This case is Mr. Singh. The petitioner has been in removal proceedings for 12 years. He has had several hearings in front of an immigration judge. He has filed two motions to reopen. He has filed three petitions for review in this Court, two of which are consolidated.  He has had several hearings in front of an immigration judge. He was represented by a lawyer who was so inadequate that he was disbarred by this Court, by the BIA, and has resigned from the bar. That lawyer was determined to be inadequate in other cases, but not necessarily in this case. In the two petitions for ---- But he was inadequate in this case, wouldn't you say? No, I would not say that. Neither did the Board of Immigration Appeals. In the two motions to reopen that were filed, both of them were untimely. The final BIA decision of October 17th, 2002, was the final administrative order of review. We know that everything that Kang did was untimely and so on, but that's not really the question at this point, because the question is whether there was an effect of assent. This one says it excuses all that, so it would be more useful to address that issue. Let's address the issue of equitable tolling, in other words. What Petitioner seeks is to toll or stop the 90-day rule that requires a motion to be reopened within 90 days, unless an exception applies, and they're not arguing that an exception does apply. But he seeks to have that 90-day period tolled from October 17th, 2002, all the way up until late January of 2008, five and a half years. The basis for it is Mr. Kang's alleged ineffectiveness. Now, the BIA determined on two points that the motion to reopen should be denied. Number one, that they did not establish the ineffectiveness. They didn't comply with the requirements to establish ineffectiveness. And two --" Kagan. First of all, don't we have case law that says definitively that when you have a disbarred there's no reason to comply with Lozada? And what would be the point of complying with Lozada? There's always a point of complying with Lozada. Well, first of all, answer my first question. Don't we have case law? We have Morales-Apulinar. Yes. Mukasey, which seems to be directly on point. But in this particular case. Why is that applicable here? Because Mr. Kang, first of all, wasn't given an opportunity to even respond to the Instead, a letter was sent to him, and that's at the Joint Supplemental Administrative Record, I believe at 171, saying we believe that the prior counsel in this case was ineffective and we intend to proceed. It didn't delineate how they determined it was ineffective. Was he disbarred at that point or was that before he was disbarred? It was after he was disbarred. After he was disbarred. Morales-Apulinar says, It would be futile for the Petitioner to inform counsel of the accusations or file a complaint, and the failure to do so does not bar her ineffective assistance of counsel. Isn't that the end of this question? All right. If it is, then let's go to the due diligence issue. Okay. The BIA determined that the clock, the 90-day clock, should start no later than August 30th of 2007. Well, that doesn't make any sense, because the day that they were appointed, they certainly couldn't find anything out. Well, actually, they were appointed earlier than that. If the Court looks at its own orders, in February of 2007, the Court order directed current counsel to be appointed pro bono for purposes of mediation. That was over 13 months before the April 2008 motion reopened. Let me ask you about this, too, when Orrick was appointed and didn't take immediate action. It wasn't clear to me from our case law, there are cases going different ways, as to whether the lack of due diligence, let's say for purposes of argument that Orrick was not duly moved forward, that that should be ascribed to Mr. Singh. I mean, Mr. Singh gave his case to, or was appointed to his attorney and presumably relied on his attorney to do what was necessary for his case. So when we're looking at whether there was adequate due diligence, are we looking at what Orrick did, or are we looking at Mr. Singh? And would Orrick's lack of due diligence, assuming that it wasn't there? Well, it should be attributed to the client also. He has a duty. Now, what do you rely on for that? I mean, because we've said a Petitioner can act due diligently, can be diligent if they are relying on an attorney, if they continue to seek legal advice, which Mr. Singh was here. Well, this Court has held that an alien's failure to follow up on his case were grounds for finding a due diligence. So there is, and that's Mockmood v. Gonzales, 427 Fed 3rd 248. So there is an obligation on the alien to follow up on his case. So is the question here whether Mr. Singh called up Orrick on a regular basis and said, what are you doing for me? Or what question are we looking at? We're looking at when did the 90-day clock start? All right. And that question, once again, you've misstated things. My understanding is that our order on February 27, 2007, was that somebody should be appointed for mediation purposes only, but that the appointment was not until August 30, 2007. Well, in that August 2007 order, it says, Order Appointing Pro Bono, Mr. Lichterman is hereby appointed to represent Petitioner in this appeal. Okay. But you stood up a few minutes ago and told me that they were appointed in February and that's not true. There is a February 27, 2007. And all it says is that somebody should be appointed. We direct the clerk to appoint pro bono counsel. Exactly. For purposes of this matter. So when someone is appointed for mediation purposes, what do you say their obligation is? Their obligation is to investigate the case to determine if they have. Litigated otherwise? I mean, that was, I would agree, an important litigating point. But is it really a point in mediation? Well, at a minimum, mediation ended in November of 2007. At the Joint Supplemental Administrative Record at page 144, there's correspondence from current counsel to the Immigration and Customs Enforcement Counsel right here in San Francisco. That's November 14, 2007. That letter says, Current counsel alleges that the former counsel, Mr. Kang, quote, failed to take obvious and appropriate steps to assist Mr. Singh effectively with immigration matters. Go ahead. So as early as November 14, nearly five months before the motion to reopen was filed, well beyond the 90-day period, the allegation was made against Mr. Kang that he was ineffective. The ICE General Counsel replied five days later, declining to enter into the joint motion to reopen. That effectively ended any mediation at that point. And we're in a proceeding. So if we look at, first of all, the board looked at the start date as August 30th, when counsel was appointed to represent the petitioner. Over seven months elapsed before that motion reopens file. I understand that's what they looked like, but does that make any sense? How are they supposed to do something the minute they were appointed, before they had any files? Well, he's got the client. He's got the final order of removal, which dated back five years before. The client is the best source of what happened in this particular case. It's not clear why the end of January was the date where the clock should start. As early as November 14th. I have a question. Were you yourself involved in mediation? No, I was not. All right. I mean, I hesitate to say this, but is there any point in having the mediation go back again? I don't understand why. Here we have somebody who do you, first of all, do you generally agree that there is no reason to think this person isn't eligible for adjustment of status? I have no reason to know that. All right. Is it true that if he is deported, that he's then just going to apply in India and come back again? Yes. All right. Why are we doing this? Because I'm representing the Board of Immigration Appeals that determined that the motion to reopen was filed in an untimely manner. Okay. And it's worth the energy of the United States government to be doing this. Yes, it is. So you don't think there's any point in trying to mediate again? No, there is not. The DHS has already determined that it won't mediate. That was made in November. Well, it was the DHS, to be frank, under a different administration. There are different people involved now. They might take a different view of what energy is worth being spent on of the resources of the government when they have real immigration problems. Well, actually, the DHS counsel that refused the joint remanding is still here. Thank you. Your Honor, I know this may be a little out of order, but may I have a moment? Go ahead. That's fine. Your Honor, the government terminated mediation. Please come here. The government terminated mediation on March 13th. The government didn't think it was effectively over before then. That's in the record. That's in our brief. But more importantly, your questions that you just raised to Mr. Day are very practical ones, very real ones, and illustrate why the appropriate relief here is for this Court to order that the matter be reversed and remanded with instructions to the BIA to remand the matter to the IJ for adjudication of adjustment of status. While I agree with your Honor's sentiments about change in administration, this is one of those situations where the bureaucrats run the show. I hate to say it, but they cross all administrations. And I think the relief here is the appropriate, the necessary relief here is to remand it with instructions. Thank you very much. Thank you, counsel. The case of Sager.
judges: Noonan, Berzon, Ikuta